```
 1                    IN THE UNITED STATES DISTRICT COURT
                         SOUTHERN DISTRICT OF TEXAS
 2                          BROWNSVILLE DIVISION


 3      _____
                                           )
 4      UNITED STATES OF AMERICA           )
                                           ) CRIMINAL ACTION NOS.
 5      VS.                                ) B-03-377 and
                                           ) B-01-1318-M
 6      JORGE LOPEZ-ORDONEZ                )
        _____)
 7

 8

 9            REVOCATION OF SUPERVISED RELEASE AND SENTENCING
                 BEFORE THE HONORABLE HILDA G. TAGLE
10                        OCTOBER 9, 2003
                            VOLUME 2
11
        APPEARANCES:
12
        For the Government:           MR. OSCAR PONCE
13                                    Assistant United States Attorney
                                      600 East Harrison, Suite 201
14                                    Brownsville, Texas  78520

15      For the Defendant:           MR. RICHARD RODRIGUEZ
                                      Attorney at Law
16                                    1117 East Harrison Ave.
                                      Brownsville, Texas  78520
17

18
        Transcribed by:              HEATHER HALL
19                                    Official Court Reporter
                                      600 E. Harrison, Box 16
20                                    Brownsville, Texas  78520
                                      (956)548-2510
21
           Proceedings recorded by mechanical stenography, transcript
22      produced by computer.

23

24

25
```



1

INDEX

2

| | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|

WITNESSES FOR THE
GOVERNMENT:

3

Marcelino Alaniz, Jr.    10    20    23    –    –

4

5

6

WITNESSES FOR THE
  DEFENDANT:

7

Jorge Lopez-Ordonez    7    4    –    –    –

8

9

10

11

12

| EXHIBITS | | Offered | Admitted |
|---|---|---|---|
| G1 | Receipt of room number 103 | 17 | 18 |
| G2 | Receipt of room number 104 | 17 | 18 |
| G3 | Receipt of room number 105 | 17 | 18 |

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1          (Call to Order of the Court.)

 2               THE COURT:  Good morning.  Please be seated.  At this

 3     time the Court calls cause numbers 03-CR-377-01 and

 4     01-M-1318-01, the United States of America versus Jorge

 5     Lopez-Ordonez, also known as Jose Geronimo-Mendez.  What says

 6     the government?

 7               MR. PONCE:  Oscar Ponce for the government.  Ready.

 8               THE COURT:  What says the defendant?

 9               MR. RODRIGUEZ:  Present and ready, Your Honor.

10               THE COURT:  All right, sir -- all right.  In cause

11     number 03-CR-377, the record reflects that the Court found the

12     defendant guilty after having adopted the report and

13     recommendation of the magistrate judge on re-arraignment.  And I

14     would -- it would appear that the Court recessed for the purpose

15     of hearing the revocation at the same time.

16          Is that right, Mr. Rodriguez?

17          Oh, Mr. Ponce, tell me what happened.

18               MR. PONCE:  Your Honor, the Court recessed.  The

19     defendant, apparently in his colloquy to the Court, did try to

20     offer some explanation for the transporting charge that he was

21     convicted of back in '96, essentially providing his version of

22     what happened in the arrest of folks in a van and he and others

23     in a Camarro.  And he actually testified, and the -- I was going

24     to be cross-examining him when I asked the Court for a recess --

25     for a continuance so that I might be able to get the report to
```

1    properly cross-examine him.

2        THE COURT:  Okay.  Yes, I recall now.  All right.  So

3    that having occurred, then, Mr. Ponce, if you intend to call

4    witnesses who must be sworn, please have them come forward at

5    this time.

6        MR. PONCE:  We have just one witness, Your Honor, but I

7    would be -- ask to be allowed to conduct my cross-examination of

8    the defendant on what he testified to before the Court.

9        THE COURT:  Okay.

10       Would you please come forward, sir?

11       THE WITNESS ALANIZ:  Good morning, Your Honor.

12       THE COURT:  Good morning.  Please raise your hand.

13    *(Witness sworn.)*

14       THE COURT:  Sir, please tell me what your name is.

15       THE WITNESS ALANIZ:  Marcelino Alaniz, Jr., ma'am.

16       THE COURT:  All right.  And, Mr. Ponce, do you wish to

17    start your cross now?

18       MR. PONCE:  Yes.

19       THE COURT:  All right.  Sir, have a seat, please.

20       THE WITNESS ALANIZ:  Thank you.

21       THE COURT:  Mr. Ponce, you may proceed.

22                JORGE LOPEZ-ORDONEZ, DEFENDANT,

23                      CROSS-EXAMINATION

24    BY MR. PONCE:

25    Q    Mr. Lopez, I'm going to be asking you a few questions.  If

1  you don't understand my question, please let me know so that I

2  can repeat myself or rephrase the question, okay.

3  A    Perfect.

4        THE COURT:  You know what?  Let me have Mr. Rodriguez

5  have a seat.

6      Sir, have a seat in the witness chair.

7        MR. PONCE:  May I proceed, Your Honor?

8        THE COURT:  Yes.

9  Q    (BY MR. PONCE)  Sir, last week -- and correct me if I'm

10  wrong, okay.  Last week you told the Court under oath that --

11  regarding the September 1996 transporting case that you were

12  convicted of, that you had come from Florida; is that correct?

13  A    Correct.

14  Q    That you were arrested in the San Antonio area?

15  A    That's right.

16  Q    With some aliens, correct?

17  A    Yes.

18  Q    And that these folks were your relatives?

19  A    An uncle, a cousin of mine and one of their friends.

20  Q    And that you didn't know anything about a van that was also

21  arrested with 17 illegal aliens, correct?  Is that what you told

22  the Court?

23  A    Can I explain that?

24  Q    Okay.  Is that what you told the Court?

25  A    What I told the Court is that I was going to -- I was going

1    to pick up my family, but not to San Antonio.  I was going to

2    pick them up in Longview, Texas.

3    Q    But you drove -- you came down all the way past San Antonio

4    to south of San Antonio to the Pleasanton, Texas, area, correct?

5    A    I arrived in Longview, but they had had a problem, which the

6    Highway Patrol had stopped them.  I was going to pick up my

7    family in Longview, and I was going to pay there, but since they

8    were stopped in San Antonio, the police themselves gave them a

9    ride to the hotel in Pleasanton.

10   Q    Okay.  But you drove from Florida all the way to Pleasanton

11   you say, correct?

12   A    To Longview.

13   Q    You're telling us that you were not in the Pleasanton area?

14   A    Yes, I was.

15        MR. PONCE:  May I approach the witness, Your Honor?

16        THE COURT:  Yes.

17   Q    (BY MR. PONCE)  Sir, I'm going to show you the originals

18   that we'll mark Exhibits 1, 2 and 3 as copies of those, but I'm

19   going to show you this.  When you were arrested, sir, you -- it

20   is true that you had in your possession this receipt for room

21   103?

22   A    No.  Impossible.

23   Q    I'm going to show you Government Exhibit No. 2.  At the time

24   of your arrest, you were in possession of this receipt that says

25   room 104, correct?

1    A    Impossible.

2    Q    I'm going to show you Government Exhibit No. 3.  It's true

3    that you had in your possession this receipt for room 105?

4    A    No, sir.

5    Q    At the time -- at the '96 incident, at the time that you --

6    the van was stopped, you saw when the agents actually stopped

7    that van, correct?

8    A    I didn't see the agents.

9    Q    You saw --

10    A    I saw the van already stopped, and a truck behind the van.

11    Q    Okay.

12    A    And I thought that it had broken down, and I returned --

13    came back.

14    Q    You didn't stop where the van was stopped to see if there

15    was any problem with it, right?

16    A    I didn't stop because further up by where the truck was, the

17    police was there, so I passed them.

18    Q    Okay.

19         MR. PONCE:  I have no further questions, Your Honor.

20         THE COURT:  All right.  Mr. Rodriguez?

21         MR. RODRIGUEZ:  A couple, Your Honor.

22                        DIRECT EXAMINATION

23    BY MR. RODRIGUEZ:

24    Q    Mr. Lopez, you were there to pick up some relatives and a

25    friend?

1    A    Yes.

2    Q    And did anybody pay you to pick them up?

3    A    No.

4            THE COURT:  Excuse me.  You have to wait until the

5    question is completed -- completely interpreted by the

6    interpreter for you unless you don't need an interpreter.  Then

7    that would make it unnecessary for the interpreter to be

8    speaking.

9            THE WITNESS:  Yes, Your Honor.

10   Q    (BY MR. RODRIGUEZ)  Did anybody pay you to pick up your

11   uncle or your cousin and their friend?

12   A    No.

13   Q    So you had gone to the hotel just to pick them up and take

14   them back to the border?

15   A    I paid them.

16   Q    You paid who?

17   A    To the person that was going in the van with me.

18   Q    You paid somebody else?

19   A    Yes.

20   Q    Okay.  But nobody paid you?

21   A    (Witness shakes head.)

22           THE COURT:  You have to answer yes or no.

23   A    No, sir.

24           MR. RODRIGUEZ:  That's all I have, Your Honor.

25           THE COURT:  All right.  Mr. Ponce?

1          MR. PONCE:   Just one question.

2                     RECROSS-EXAMINATION

3    BY MR. PONCE:

4    Q   Were you expecting to be paid anything for your troubles

5    coming all the way down from Florida?

6          THE COURT:   Excuse me.   You have to wait until the

7    question is translated for you unless you do not need an

8    interpreter.

9    A    No, sir.   They were my relatives.

10   Q    (BY MR. PONCE)   Even the other individual that was the

11   friend of your relatives?

12   A    He had already paid.

13   Q    To who had he paid?

14   A    The ones who were bringing him.

15   Q    All of them were -- in your vehicle were illegal aliens,

16   right?

17   A    Yes, it's true.

18   Q    You knew that?

19   A    Yes, I knew.

20         MR. PONCE:   I have nothing further, Your Honor.

21         THE COURT:   All right.   Then, Mr. Rodriguez, anything

22   else?

23         MR. RODRIGUEZ:   Nothing further, Your Honor.

24         THE COURT:   All right.   Sir, you may step down.

25      All right.   Mr. Rodriguez, any other witnesses?

1          MR. RODRIGUEZ:  I have nothing further, Your Honor.

2          THE COURT:  All right.  Then, Mr. Ponce, call your

3     witness.

4          MR. PONCE:  Mr. Alaniz.

5          THE COURT:  You may proceed.

6            MARCELINO ALANIZ, JR., GOVERNMENT'S WITNESS,

7                      DIRECT EXAMINATION

8     BY MR. PONCE:

9     Q    Sir, would you state your full name and how you're employed?

10    A    Marcelino Alaniz, Jr.  I'm the Assistant Special Agent in

11    Charge, San Antonio, Texas, Immigration and Customs Enforcement.

12    Q    I'm sorry.  Can you repeat that again, and could you move up

13    to your microphone, please?

14    A    Marcelino Alaniz, Jr.  I am the Assistant Special Agent in

15    Charge, Immigration and Customs Enforcement in San Antonio,

16    Texas.

17    Q    Sir, back on September the 8th of 1996, how were you

18    employed?

19    A    I was employed by the then Immigration and Naturalization

20    Service, Supervisory Special Agent, Anti-Smuggling Unit.

21    Q    Okay.  Sir, were you recently contacted in the last -- late

22    last week or early this week regarding a '96 case --

23    September 8th, '96 case that involved alien smuggling?

24    A    Yes, sir.

25    Q    On an individual named Rodolfo Primero Segundo and a second

1   individual by the name of Jorge Lopez-Ordonez?

2   A    Yes, sir.

3   Q    You're familiar with the facts of that case, sir?

4   A    Yes, sir, I am.

5   Q    What was your -- your title or your employment back in '96,

6   September, on this date was?

7   A    I was Supervisory Agent in San Antonio, Texas.

8   Q    Okay.  On that day in question, did you receive a report of

9   a possible smuggling of aliens at a certain location just south

10  of San Antonio near the Pleasanton, Texas, area?

11  A    Yes, sir, I did.

12  Q    Just very briefly, what was the nature of that report?

13  A    I was -- I received a call that there believed to have been

14  a large number of aliens in room 103, 104 and 105.

15  Q    Of what hotel or motel?

16  A    That was the Kountry Korner Motel on Interstate 37 South.

17  Q    And it's located how far from San Antonio?

18  A    Approximately 40 miles south on Interstate 37.

19  Q    And did you send an agent to surveil the place?

20  A    Yes, sir, I did.

21  Q    What did that agent see just in very general terms?

22  A    He left --

23        THE WITNESS:  If I may refer to my notes, Your Honor?

24  It's been a while.  I just don't --

25        THE COURT:  Yes.

1   A    I dispatched Agent Gilberto Wise to the location to set up

2   surveillance.  We work the area very frequently.  We get a lot

3   of reports out of that area.  It's an area that's used quite a

4   bit to stage aliens to move further north or wherever they're

5   going from there.

6        And I sent Mr. Wise to set up, and I told him -- I only sent

7   him and put two others on standby due to the fact that most of

8   the time it's been our experience that most of these people,

9   once they get there, they don't move till the nighttime hours --

10  or as soon as it starts to get dark, that's when they move.  So

11  it being that it was still early during the day, I sent him out

12  there to sit on it and wait to see if there was any movement or

13  activity any place.

14  Q    (BY MR. PONCE)  Did he -- he did, in fact, see some activity

15  sometime after he got there, correct?

16  A    Yes, sir, I believe he did, and --

17  Q    What did he observe in and about the rooms you mentioned?

18       MR. RODRIGUEZ:  Your Honor, I'm going to object to

19  testifying to what another agent saw.

20       THE COURT:  Overruled.

21  A    He got there about 1:00 p.m.  Then about 7:30 he observed

22  one male exit one room, go to an adjoining room and brought

23  some -- what appeared to be sodas or water, and then went to the

24  other rooms -- 103 and 104 -- and did the same thing.

25       MR. RODRIGUEZ:  Your Honor, I'm going to again object to

1    reading from a report that's not in evidence and that's not his

2    own writing.  He's reading from somebody else's report.

3            THE COURT:  I'm going to allow it.  Overruled.

4    Q    (BY MR. PONCE)  Did he, at about 7:40, observe any vehicle

5    or vehicles arriving in the area?

6    A    He observed a beige-colored van towing a -- some kind of

7    Camarro and a dolly.  I guess a car dolly.

8    Q    What happened to that Camarro once it got the van -- got

9    there to the parking lot of the -- of this place.

10   A    It was subsequently unloaded from the dolly that it was in.

11   Q    This Camarro had Florida plates?

12   A    Yes, sir.

13   Q    Okay.  What happened, then, just a few minutes after the

14   vehicle was unloaded?

15           MR. RODRIGUEZ:  Your Honor, I hate to interrupt, but

16   could I just have a running objection to hearsay on this

17   testimony?

18           THE COURT:  Yes.

19           Go ahead.

20   A    The van moved to one of the rooms, and -- in front of one of

21   the rooms, and shortly thereafter a subject later identified as

22   Mr. Primero went out room to room and started talking to the

23   people and apparently loading people in the van.

24   Q    (BY MR. PONCE)  Okay.  Now, while this was going on, did --

25   did any activity occur in and about the Camarro area?

1   A   The best I could tell you, sir, the best of my knowledge on

2   that was that the subject driving the Camarro got three subjects

3   in the vehicle with him.

4   Q   Okay.  But you say the subject got in the Camarro.  The

5   subject was not driving the Camarro at that point?

6   A   Well, no, he got -- went to the room, got these people and

7   then walked back to the car.

8   Q   This is the one who had been originally a passenger in the

9   van as it arrived?

10  A   That's correct, sir.

11  Q   Okay.  So now that this person who is a passenger in the van

12  gets three adult males, walks over to the Camarro, what happens?

13  A   After the -- the van was loaded up, apparently they got into

14  the Camarro.  My agent chose to follow the van, which headed

15  north on 37.  And apparently the van -- the Camarro -- to the

16  best of my knowledge, the Camarro stayed at the location for

17  some unknown reason.

18  Q   So the van headed north?

19  A   That's correct, sir.

20  Q   Did the van eventually get to Highway 410, the one that

21  loops around?

22  A   Yes, sir, it did.

23  Q   Did the van, as it was followed by the agent, loop north?

24  A   Yes, sir.  It took 35 north off of 410.

25  Q   What happened then?  Was the van subsequently stopped as it

1  passed -- went north and continued up on IH-35 as it headed

2  toward -- I guess toward the Austin area?

3  A   That's correct, sir.  Two other agents had by then arrived

4  at the scene and were -- also had joined Agent Wise, and they

5  were following the van north on 35.  As soon as they got to 35

6  and 410 -- or 410 and 35 -- the van started heading north on 35,

7  they radioed to me, advised me of the situation.  I told them to

8  try to get a safe location where they could pull this van over

9  and go ahead and pull an immigration check on it.

10  Q   Okay.  And as a result, 17 illegal aliens were found in that

11  van driven by the individual you've identified as Rodolfo

12  Primero-Segundo, correct?

13  A   That's correct, sir.

14  Q   Okay.  And while the agents were conducting that traffic

15  stop of the van, did any of your agents see the Camarro that had

16  been last seen at the hotel about 30 or 40 miles south near the

17  Pleasanton area now in or near the stop of where the van

18  occurred?

19  A   Agent Wise observed it going northbound off of 35 and

20  recognized it and recognized the plates on it.

21  Q   Okay.  But the Camarro didn't stop at the scene there where

22  the van was with the 17 aliens, correct?

23  A   No, sir.

24  Q   Okay.  So did he then attempt to follow the Camarro and

25  eventually try to stop it?

1    A    Yes, sir, he did.  Since there was just three agents on the

2    scene, he left the other two agents with the van.  He followed

3    the Camarro.  He radioed me for assistance, which I went north

4    and caught up with him just south of New Braunfels on 35.

5    Q    So your agent left two other agents at the scene where the

6    van was?

7    A    Yes, sir.

8    Q    So you caught up with him and prepared to make a stop?

9    A    Yes, sir, we did.

10   Q    Was the driver of that Jorge Lopez-Ordonez?

11   A    Yes, sir.

12   Q    And he had three illegal aliens with him?

13   A    That's correct, sir.

14   Q    Okay.  Is this the same vehicle that had been observed in

15   and about the motel area by Pleasanton?

16   A    According to my agent, yes, sir.

17   Q    Okay.  Did -- the driver Lopez-Ordonez was taken into

18   custody?

19   A    Yes, sir, he was.

20   Q    Did -- was certain -- were certain items of evidence removed

21   from his possession?

22   A    All his personal belongings were removed from his possession

23   once we got to the office.

24        MR. PONCE:  May I approach the witness, Your Honor?

25        THE COURT:  Yes.

1   Q    (BY MR. PONCE)   I'm going to show you the originals, but

2   I'll mark Government's Exhibits 1, 2 and 3 as copies.   And can

3   you tell me what -- what 1, 2 and 3 are -- and you've seen the

4   original.   Here's one.

5   A    Yes, sir.

6   Q    Here's two, and here's the third one.   Can you tell us what

7   was in his possession?

8   A    These are receipts from the rooms at the Kountry Korner

9   Hotel there.

10  Q    For rooms 103, 104 and 105?

11  A    That's correct, sir.

12  Q    Those were the three rooms where the different aliens were

13  seen coming from, including the 17 that were arrested in the

14  van?

15  A    Yes, sir.

16  Q    And this is, as you said, the Kountry Korner Motel in --

17  near Pleasanton, Texas, correct?

18  A    Yes, sir.

19  Q    Okay.

20       MR. PONCE:   Move to admit 1, 2 and 3, Your Honor.

21       THE COURT:   Mr. Rodriguez?

22       MR. RODRIGUEZ:   Is he offering them just for the

23  receipts from the hotel or that they were found on his

24  possession?

25       MR. PONCE:   Well, both.   They are receipts from the

1    hotel, and they were found in his possession.

2         MR. RODRIGUEZ:  No objection.

3         THE COURT:  Admitted.

4    Q   (BY MR. PONCE)  Were the witnesses questioned, sir?

5    A   Yes, sir, they were.

6    Q   The material witnesses, the different aliens in the

7    vehicles?

8    A   Yes, sir, they were.  They were all questioned.

9    Q   Did they indicate that either they had paid or were going to

10   pay money to the transporter for movement further north?

11   A   According to the sworn statements they gave, yes, sir.

12   Q   By the way, the copies that we submitted as Government's 1,

13   2 and 3, the -- the front of each receipt -- let's go with

14   Government's Exhibit No. 1.

15        MR. PONCE:  May I approach the witness, Your Honor?

16        THE COURT:  Yes.

17   Q   (BY MR. PONCE)  What is -- what is the Government Exhibit

18   No. 1, the front of the receipt?

19   A   What is it?  It just tells the room number, the rate, the

20   date, the amount paid and a $5 key deposit and who it was

21   received by.

22   Q   And that is for room what, sir?

23   A   103.

24   Q   Okay.  Now, and on that Government Exhibit No. 1, we also

25   copied the back part of that receipt, right --

1   A    Yes, sir.

2   Q    -- underneath what would have been the front of the receipt,

3   correct?

4   A    Yes, sir.

5   Q    And what is that part?

6   A    It says Kountry Korner Steaks and Eggs, 37 and Jim Brite

7   Road in Pleasanton, Texas, phone number whatever.

8   Q    The motel under surveillance, correct?

9   A    Yes, sir.

10  Q    Okay.  I will ask you to identify the Government Exhibit

11  No. 2?

12  A    Same thing except for room 104.  Same address.

13  Q    The address on the back indicated on that -- the original

14  receipt?

15  A    Yes, sir.

16  Q    And finally No. 3?

17  A    105 -- room 105 with the same thing, sir.

18  Q    And by the way, the writing on the top of each of these

19  exhibits is whose writing, sir?

20  A    That is Agent Gilberto Wise's writing -- handwriting.

21  Q    And that was done back in 1996 when the case was put

22  together?

23  A    Yes, sir.

24       MR. PONCE:  I have nothing further, Your Honor.

25       THE COURT:  Mr. Rodriguez?

CROSS-EXAMINATION

1

2  BY MR. RODRIGUEZ:

3  Q   Agent, you testified that your surveillance began when you

4  had a report that there was possible aliens at a motel?

5  A   I dispatched an agent at that time, sir.

6  Q   Okay.  And this was during the day?

7  A   Yes, sir.

8  Q   And I think then you further testified that a report came in

9  that a van and a Camarro pulled up?

10  A   No, sir.  That was the report from my agent.  He was on the

11  scene.  He was already there.  Agent Wise was on the scene.  He

12  called me and said, "We got movement up here.  We just had these

13  vehicles arrive."

14  Q   Okay.  The point being, though, the aliens were there before

15  the van and the Camarro got there?

16  A   To the best of our knowledge, yes, sir.

17  Q   Okay.  So the rooms were already rented before the van and

18  the Camarro got there?

19  A   I suppose so, yes, sir.  They were there.

20  Q   So then whoever rented the rooms were in possession of the

21  receipts for the room receipts?

22  A   I suppose so, sir.  I don't know.

23  Q   So when you testified that these receipts were found on

24  Mr. Ordonez, was it possible you're mistaken because they were

25  rented by somebody else?  They weren't rented by him?

1   A    Sir, I don't know who rented the rooms.  I just know the

2   receipts -- what I testified to was the receipts were found on

3   his person.

4   Q    Okay.  But, again, someone else had rented the room.

5   Someone else paid for the rooms.

6   A    I don't know, sir.

7   Q    And now it's your testimony -- isn't it true he had a ticket

8   from Florida in his possession and a receipt from U-haul for the

9   dolly that the Camarro was on?

10  A    I believe those were in the glove compartment of the

11  vehicle, sir.

12  Q    Okay.  So that was in his possession?

13  A    Well, it was in the glove compartment of the vehicle.

14  Q    Could it be that during the arrest and the inventory of

15  items that these motel receipts were inadvertently stuck or

16  associated with him when really they shouldn't have been?

17  A    Well, sir, the thing is that the driver -- the drivers are

18  kept separate from one another.  They're not allowed contact

19  with one another.  They're processed in separate areas.  They

20  are searched in separate areas, so --

21  Q    You don't know whether they could have gotten mixed up with

22  anybody else?

23  A    I don't that they could have gotten mixed up with anybody

24  else that I know of.

25  Q    Okay.  Is there -- it said in the report that these receipts

1    were found on him?

2    A    Yes, sir.

3    Q    May I see that?

4         MR. RODRIGUEZ:  May I approach, Your Honor?

5         THE COURT:  Yes.

6    Q    (BY MR. RODRIGUEZ)  Is this the report that either you or --

7    was it Agent Lopez?

8    A    No, Agent Wise -- Gilberto Wise.

9    Q    Agent Wise?

10   A    Yes, sir.

11   Q    Is it in this report where it says that the receipts were

12   found on him?

13   A    I don't -- I would have to look, sir.  I know it was on

14   evidence -- the evidence sheet that he prepared.

15   Q    Oh, yeah.

16        THE REPORTER:  I'm sorry?

17   Q    (BY MR. RODRIGUEZ)  I realize it was on that one.  What

18   about this one?

19        THE COURT:  Excuse me.  You need to specify since you're

20   making a record.

21        MR. RODRIGUEZ:  I apologize, Your Honor.

22   Q    (BY MR. RODRIGUEZ)  I realize it was on the paperwork that

23   was submitted as evidence to the Court.

24   A    Yes, sir.

25   Q    But not on this report from Agent Wise?

1    A    No, sir.  And normally nothing of -- really like that is on

2    here.  I don't see it.

3    Q    Is there anything on this report that indicates that they

4    were paying Mr. Ordonez to transport them?

5    A    No, sir.

6    Q    Thank you.

7        MR. RODRIGUEZ:  That's all I have.

8        THE COURT:  Mr. Ponce?

9        MR. PONCE:  Just one matter, Your Honor.

10                       REDIRECT EXAMINATION

11   BY MR. PONCE

12   Q    Sir, I'm going to ask you to take a look at the report you

13   have there.  By the way, this is not your report, as you said,

14   but this is one you signed as supervisor and approved, correct?

15   A    Correct, sir.

16   Q    Okay.  I'll ask you just to refer to page two under

17   Immigration Status.  Do you see that?

18   A    Yes, sir.

19   Q    And the second part under Immigration Status concerns this

20   defendant, the subject of this offense; is that correct?

21   A    That's correct, sir.

22   Q    Do you all at that time -- did the agent at that time put in

23   here the nationality of the defendant Lopez?

24   A    Yes, sir.

25   Q    And did he indicate when this person supposedly told the

1    agent he had entered the United States just prior to the

2    incident of September the 8th of 1996?

3    A    Yes, sir.  He advised the processing agent or Agent Wise

4    that he entered the United States by wading the Rio Grande River

5    near Brownsville on or about September 6, 1996.

6             MR. PONCE:  I have nothing further.

7             THE COURT:  Mr. Rodriguez?

8             MR. RODRIGUEZ:  Nothing further, Your Honor.

9             THE COURT:  All right.  Sir, you may step down.

10         Does the government rest?

11            MR. PONCE:  Yes, Your Honor.

12            THE COURT:  All right.  Mr. Rodriguez?

13            MR. RODRIGUEZ:  Your Honor, the basis of this whole --

14    our objection to the PSI was that he was convicted of a matter

15    for profit.  I think the testimony shows that he was there to

16    pick up his relatives, and it wasn't for profit.  I believe it

17    was clear that he was involved in some type of -- bringing them

18    in, but not for the profit aspect of it.  So we would like the

19    Court to not assess the extra points associated with the

20    for-profit penalty that this -- that this charge carries with

21    it.

22            THE COURT:  Mr. Ponce?

23            MR. PONCE:  Your Honor, we submit that he has not

24    sustained his burden on that.  This incident occurred on

25    September the 8th, 1996.  We know from the reports, from what

1    the agent testified, that a van pulling a Camarro on a dolly

2    arrived at that motel, and that motel surveillance indicated

3    three rooms were associated with illegal aliens that were being

4    processed or being -- getting ready to be taken up north.  At

5    the time that the aliens left, three in the van -- at least

6    three of these individuals went with the passenger of that van,

7    which was ultimately found to be the driver of the Camarro, this

8    defendant here.

9        He left with those aliens.  He says to the Court here that

10   he was driving by.  He noticed there was some problem with

11   the -- with the van.  If we were to believe him when he says,

12   "Well, I saw that there was some -- a police unit or so there,"

13   it would be reasonable to conclude he would have stopped if he's

14   travelling with these folks together to find out what was going

15   on or wait for the van to be processed.

16       Instead, he continued north, and continued north until

17   eventually he was stopped near New Braunfels.  We submit to the

18   Court that he just drove by, didn't stop because he knew what

19   was happening.  He says that he just arrived there to pick up

20   his relatives, yet in his possession they find receipts for

21   hotel -- motel room 103, 104 and 105, the same rooms where

22   aliens were, in fact, seen coming out of, aliens associated with

23   the van.

24       And, finally, he says that he was coming in -- he drove down

25   from Florida, that -- and was going to take his relatives.  At

1    the time of his processing, he told the agents that he had come

2    across into the United States on September 6 of 1996, two days

3    before.  So we submit to the Court that circumstantally I think

4    we can put pieces of the puzzle together to show that this

5    individual was in Mexico a few days before September the 8th,

6    perhaps came with the other individual, and those -- that group

7    of aliens up to just south of San Antonio, the staging area

8    that's commonly used by aliens, and that at that point he was

9    going to separate and go his -- go his way -- go his way to take

10   individuals to the Florida area perhaps.  But, nevertheless,

11   that he was involved in the transporting of those 17 other

12   aliens because he was involved in that conspiracy with that

13   other person.

14        And for him to say that he was doing this because they were

15   just relatives and he was not going to get paid, the agent

16   testified that the aliens said they had paid or were going pay

17   the smugglers, this defendant being one of the smugglers.  It

18   wouldn't make sense for him to do all these things and not get

19   some sort of recompense, Your Honor.  For that reason, we

20   believe that --

21        MR. RODRIGUEZ:  Your Honor, may I address one point?  I

22   apologize.  If I had known he was going to bring that up, I

23   would have -- the agent testified there was a speeding ticket

24   found in his possession from Florida and also the U-haul receipt

25   is from Florida.  So this theory about he came in two days

1    before doesn't wash because he was living in Florida.  There's

2    no way he could have rented a U-haul, gotten a speeding --

3    entered one day, drove all the way to Florida, turn around and

4    pick up a U-haul and drive all the way back.

5              THE COURT:  Okay.  Well, let me tell you how I see that.

6    In particular the --

7         I don't know.  Mr. Ponce, did you wish to say something?

8              MR. PONCE:  Yes, Your Honor.  I did show these exhibits

9    to defense counsel.  The speeding ticket is for an individual

10   named Sergio Diaz Gonzales.  Sergio Diaz Gonzales, whoever he

11   might be, is the individual that also rented that -- that

12   U-haul, that trailer.  So not this defendant.

13             MR. RODRIGUEZ:  That was his alias at the time.

14             THE COURT:  Well, okay, this is how I see it.  First of

15   all, everything -- you know, this particular objection rests

16   primarily on your client's credibility, which is very suspect.

17   He tells the person who processes him that he entered the

18   United States just a couple of days before this incident.  So

19   that's one thing.

20        The second thing is that as far as credibility, he's already

21   lied to the agents who stopped him.  Now he wants me to believe

22   him when he says that things occurred the way he says now.  It

23   may very well be that he was in Florida and that he used his

24   alias when he was given that speeding ticket as well as when he

25   rented the U-haul or whatever he rented -- the dolly, but that's

1    also another example of where he has not been truthful.

2        Third, this event occurred on September the 8th, 1996.  It

3    involved the transporting of illegal aliens.  Then just

4    June 7th, 2001, he is found guilty -- or I guess it occurred

5    June 8th, 19 -- 2001.  He was found guilty of aiding and

6    abetting in very similar circumstances where he is -- there were

7    several people exiting a vehicle that he was driving.  They were

8    able to stop only one material witness and that he -- that that

9    material witness at that time claimed that he was going to pay

10   this defendant $3,000 for transportation; that a person in

11   Nebraska had already wired Mr. Ordonez $1,000.  He was convicted

12   in that case under a different name, but, you know, this is

13   another incident in which he has not been truthful.

14       So for all those reasons, the similarity of these

15   circumstances where he was doing clearly something for profit in

16   2001, the fact that he has not been truthful on many occasions,

17   including the Court -- including to the Court in a prior

18   proceeding in the case in which he was placed on -- on probation

19   for makes him a very uncredible witness in connection with his

20   evidence that he was not doing this for profit.

21       So the objection to the assessment of points for the

22   conviction in cause number SA-96-CR-2792; that is, the finding

23   or assessment of points because of the evidence that he did so

24   for profit, is overruled.

25       All right.  The Court having overruled the objection,

1    anything else, there being no plea agreement, Mr. Ponce?

2            MR. PONCE:  The government -- nothing further other than

3    what's already provided to the Court in the PSI.  We ask further

4    that -- I don't know if the Court's handled the supervised

5    release revocation, but we ask that that supervised release term

6    be revoked upon the defendant's plea if he pleas.

7            THE COURT:  Okay.  Well, yeah.  Let me be more specific;

8    that is, the objection to the assessment of 16 points pursuant

9    to sentencing guideline 2L1.2(b)(1)(A) in paragraph 13.  I may

10   have already done this, and so I'm going to have to make sure

11   that I do so again.

12       Sir, you indicated to the Court that your name is Jorge

13   Lopez-Ordonez.  You are still under oath for the purpose of this

14   proceeding -- both proceedings that the Court has -- is

15   preparing to sentence you on as well as cause number 01-1318-M.

16   Are you also known or have you also been known as Antelmo

17   Castillo-Martinez?

18           THE DEFENDANT:  Yes, Your Honor.

19           THE COURT:  Under that name, were you found guilty of

20   aiding and abetting a certain alien and thereafter sentenced to

21   a 90-day term of imprisonment, and, thereafter, the sentence

22   having been suspended for three years' probation without

23   supervision, were you thereafter placed on supervision on

24   June 8th, 2001?

25           THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  Did you understand that the conditions of

2     probation included that you were not to violate the law, state,

3     federal or local?

4          THE DEFENDANT:  Yes, Your Honor.

5          THE COURT:  And have you received a copy of the petition

6     in this case that alleges that you violated the conditions of

7     probation in cause number 01-1318-M in that you committed the

8     offense of being an alien unlawfully found in the United States

9     after deportation?

10          THE DEFENDANT:  Yes, Your Honor.

11          THE COURT:  How do you plead to that allegation, true or

12     not true?

13          THE DEFENDANT:  True.

14          THE COURT:  Then based upon your plea of true, the Court

15     finds that you have violated your term of probation and hereby

16     revokes your term of probation.

17       Now, as to the sentence to be imposed in -- in both cases,

18     Mr. Rodriguez, you may address the Court.

19          MR. RODRIGUEZ:  Your Honor, we would respectfully

20     request that the Court sentence him to the low end of the

21     guidelines.  I realize that he's had a few problems, but he does

22     want to get back to Mexico with his family.  His wife's been

23     here supporting him the whole time.  They both want to start

24     their life back in Mexico and move the whole family back to

25     where they're at.

1    He -- I think Mr. Lopez-Ordonez apologizes to the Court for

2  what he's done, but -- and realizes he has to do some time in

3  regards to that, but we would just ask that -- you know, that

4  you do sentence him to the low end of the guidelines.  I believe

5  the probation office also recommended a 90-day sentence for the

6  violation.  We would hope that you would follow that also.

7         THE COURT:  All right.  Probation?  Does the officer

8  wish to be heard?

9         THE PROBATION OFFICER:  We have nothing further, Your

10  Honor.

11         THE COURT:  All right.  Then, sir, is there anything you

12  wish to say to the Court?

13         THE DEFENDANT:  I was asked under oath what was my real

14  name.  I told you Sergio Gonzales-Diaz, and I think I have a

15  copy of my license -- Texas license where it shows my name.

16  With that license is that I rented a U-haul in Florida.

17         MR. RODRIGUEZ:  May we have a minute, Your Honor?

18      *(Sotto voce discussion between counsel and defendant.)*

19         THE DEFENDANT:  But I already told you the truth as to

20  my name.  Now I only have to make myself responsible for my

21  actions, and I only beg you -- I don't know how you see this

22  matter, but I wish for you to give me another chance so that I

23  can show you how sorry I am.  I know you are a very fair judge.

24  I'm sure you will consider my situation.  I want to start a new

25  life with my wife in Mexico, with my children, and never return

1    to this country again.  Thank you, Your Honor.

2          THE COURT:  I see here in the presentence report that

3    your family has a much higher than average education.  You have

4    a brother who's an accountant; one who's a professor --

5    university professor; another one who is a student and is

6    completing her master's degree in chemical engineering; and that

7    you have a sister who's a chemical engineer.

8          I see also that you planned to study medicine, but that you

9    dropped out of school to enter the United States.  So it's

10   regrettable that you have not made your life in Mexico in an

11   honest way, but instead have been returning to this country for,

12   I'm assuming, more money than you could have earned had you

13   stayed in your country.  But the fact of the matter is that had

14   you stayed in your country and completed your education, you

15   would not have been in and out of jail all these times.

16         And I see here in your list of aliases -- you know, I don't

17   know how it is with good conscious or -- expect me to believe

18   anything you say given that we have the name of Antelmo Martinez

19   Castillo, Jorge Lopez-Ordonez, Aurelmo Castillo-Martinez, Sergio

20   Gonzales-Diaz.  You know, surely you have been placed under oath

21   at various times when you have given this -- these names and

22   when you have been detained by law enforcement when it is your

23   obligation to give truthful answers about who you are.

24         But I know what the incentive is because if you give a name

25   that's not yours, then you make it harder for them to track down

1    your past record.  So the fact of the matter is I don't find you

2    to be credible about anything.  I do hope that you mean what you

3    say about having your family move to Mexico to make a life there

4    because that's -- like I said, you know, you have a child now.

5    It looks like you only have one child, although you may be

6    raising others or providing for others from a previous

7    relationship.  But the fact of the matter is that I have no

8    choice but, pursuant to the Sentencing Reform Act of 1984,

9    sentence you to a term of imprisonment of 51 months.

10          In cause number 01-1318-M, the Court having revoked your

11    term of probation hereby sentences you to a term of imprisonment

12    of 90 days.  Said sentences are ordered to run consecutive to

13    each other for a total of 54 months.  Upon your release from

14    imprisonment, you shall be placed on supervised release for a

15    term of three years.

16          During the three-year period, even if you are deported and

17    therefore not in this country for direct supervision, you still

18    have the obligation to comply with all standard, mandatory and

19    special conditions of supervised release that include that you

20    are not to violate the law, state, federal or local.  Should you

21    violate the law in any respect during this three-year period,

22    the law provides that you may be brought back into court in

23    connection with this case and that you may be ordered to serve

24    more time in prison than the 51 months I'm ordering today.  Do

25    you understand that?

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  In the future, if you return to this country

3    illegally, do you understand that the law provides that you --

4    and if you're found guilty of the same kind of offense that I've

5    found you guilty of, that you may be subject to a longer term of

6    imprisonment than the 46 to 57 months you were facing today?  Do

7    you understand that?

8          THE DEFENDANT:  Yes, Your Honor.

9          THE COURT:  And, again, if the basis for a revocation of

10    your term of supervised release is that you committed another

11    crime during that three-year period, the same thing would happen

12    again -- or you're subject to having the same thing happen

13    again, that you get sentenced to a term of imprisonment for a

14    new case and that any sentence that is ordered on the revocation

15    would be ordered to be served consecutive to each other.  Do you

16    understand that?

17          THE DEFENDANT:  Yes, Your Honor.

18          THE COURT:  Then the conditions shall also include that

19    you are not to possess a firearm or other destructive device and

20    that you are not to illegally possess or illegally consume a

21    controlled substance, and, again, that you are not to reenter

22    the United States illegally.  The Court finds that you are

23    indigent and are unable to pay a fine, and, therefore, waives

24    the imposition of a fine.  However, the Court does impose a

25    special assessment of $100, which the Court will order remitted

1    should the government move to do so based upon your indigency.

2         MR. PONCE:  We move to remit so the defendant doesn't

3    have to pay that special assessment.

4         THE COURT:  The motion's granted.

5      Sir, these sentences are in conformance with the Sentencing

6    Reform Act of 1984.  As justification for the sentence in cause

7    number 03-CR-377, the Court adopts the findings in the

8    presentence report.  As to the sentence in the revocation; that

9    is, the 01-1318-M, the Court uses as its basis the nature of the

10   allegations that the Court has found that you have committed in

11   that cause number as a basis for the sentence of 90 days.

12     The -- sir, the law does provide that you have a right to

13   appeal your sentence, and you can do so even though you're

14   indigent, but you must give notice of that intention within ten

15   days.

16     Anything else?

17        MR. RODRIGUEZ:  Your Honor, could the Court recommend

18   that he be sent to Three Rivers so that he could be close to his

19   spouse down here?

20        THE COURT:  I'll make that recommendation.  We're in

21   recess.

22        MR. RODRIGUEZ:  Thank you.  May I be excused?

23        THE COURT:  Yes, you may.

24                          *  *  *

25        (End of requested transcript.)

-oOo-

1

I certify that the foregoing is a correct transcript from

the record of proceedings in the above matter.

Date:  April 25, 2005

_Heather Hall_

Signature of Court Reporter